FIRST NATIONAL BANK OF NASHVILLE *v.* HUGH L. McCLUNG *et al.*

BILLS AND NOTES. *Endorser. Payment.* A bank at Nashville discounted a note on which a Knoxville bank was endorser, and sent the note to the latter bank, its regular correspondent—the two banks having running accounts with each other, settled monthly—with instructions to collect and put proceeds to its credit, and the Knoxville bank, at the maturity of the paper, entered the sum due to the credit of the Nashville bank, having at the time money on hand sufficient to pay the debt, although it was in fact insolvent, and made an assignment two days thereafter. *Held,* a payment of the note.

FROM KNOX.

Appeal from the Chancery Court at Knoxville. W. B. STALEY, Ch.

HENDERSON & JOUROLMON for complainants.

CALDWELL & SON and T. S. WEBB for defendants.

COOPER, J., delivered the opinion of the court.

On January 29, 1877, H. L. McClung & Co., a firm doing business at Knoxville, executed their note of that date, payable sixty days thereafter, to W. H. Turley or order, at the Commercial Bank of Knoxville, for $2,500, with interest at the rate of ten per cent. per annum after maturity. This note was endorsed by W. H. Turley, and the Commercial Bank, and was discounted by the First National Bank of Nashville, the proceeds being received by the Commercial

Bank, for whose benefit the note seems to have been made, and by whom it was sent to the First National Bank. On February 1, 1877, the First National Bank returned the note by letter to the Commercial Bank "for coll. & cr." These abbreviations are proved to mean: "Collect the note and place the amount to the credit of First National Bank's account." The note was entered on the ledger of the Commercial Bank to the credit of bills payable, in that way showing, according to the testimony of the book-keeper of the bank, that the bank owed that much money. At the maturity of the note, April 2, 1877, it was charged to bills payable, thereby showing that the Commercial Bank now owed the First National Bank $2,500, instead of an outstanding note for a like amount, and the sum called for, like other collections for that bank, was passed to the credit of the First National Bank. The Commercial Bank was the regular Knoxville correspondent of the First National Bank of Nashville, and the two banks kept running accounts with each other. At the end of each month, the First National Bank would order its balances remitted to New York, and the Commercial Bank would remit either the exact balance to credit of First National Bank, or an approximate amount. At the time the amount of the note was credited to the National Bank, the Commercial Bank had money sufficient to pay it, but no money was paid, and the bank was then insolvent. On the 4th of April, 1877, two days thereafter, the Commercial Bank stopped business, and made a general assignment of its property and effects for

the benefit of its creditors. This bill was filed on December 8, 1877, against the makers and endorsers of the note, and the trustee of the bank, to collect the note as still outstanding. The record discloses the facts to be as above recited.

Of course, it is of no consequence to the complainant whether the Commercial Bank be held liable to it by reason of the endorsement of the note, or for the money treated as collected. In either event, the recovery will be the same. The contest is, therefore, over the liability of the makers and the first endorser. We start out with the fact that the note was executed by them for the accommodation of the Commercial Bank, and that the bank was the principal debtor. It does not appear whether the relation of the parties to the paper was known to the First National Bank, except so far as it may be inferred from the fact that the Commercial Bank sent the note to the First National Bank, and received the proceeds of its discount. The Commercial Bank was the correspondent and collecting agent at Knoxville of the National Bank, and the usual course of dealings was to enter the amounts collected to the credit of the National Bank, and to send the credit balance at the end of the month to New York according to instructions. If the note in controversy had been altogether on third persons, it is very certain that a mere entry of the amount on the books of the bank, to the credit of the National Bank, without any actual collection of the money would not, ordinarily, release the parties to the paper. On the other hand, if the note had been executed by the

Commercial Bank alone, and had been sent to it "for collection and credit," the passing of the amount of the note at maturity to the credit of the National Bank, would ordinarily have been a good payment, for it would· have been all that the bank could do under the instructions. The question, then, is narrowed down to this: Does the fact that there were other parties on this paper, who were there for the accommodation of the Commercial Bank, or the condition of the bank at the time, change the result?

The authority of the bank was to collect, which necessarily meant that it might collect from any party bound upon the note. It might,. therefore, collect from itself, precisely as it would have done if it had been the only party liable. It was further directed what to do with the money collected, namely, to place it to the credit of the National Bank on its books. If, therefore, it then had the money with which to pay, and did actually appropriate it in the mode prescribed by passing it to the credit of its correspondent, it is difficult to see how the result could be otherwise than a payment of the debt, and a release of the accommodation sureties: Dan. Neg. Inst., sec. 1221. The proof is that it did have the money with which to pay, and, although insolvent, continued to do business for that and the following day. The entry·of the credit was, under the direction given, as effective as if a depositor had brought in on that day the check of another customer, and had it entered to his credit. The bank may be said to have acted in bad faith, in view of its actual condition, to both class of custom-

ers, but its action would be good nevertheless, and the loss would fall upon the party dealing with it: *Eyles* v. *Ellis*, 4 Bing., 112.

The decree of the chancellor will be reversed, and the bill dismissed with costs.

FREEMAN, J., delivered the following dissenting opinion:

This bill is filed against the makers and endorsers of a certain promissory note, to enforce its collection by the holder, based on the following state of facts:

H. L. McClung & Co. was a commercial firm, doing business in the city of Knoxville. The following note was made by said firm:

$2,500.                Knoxville, Tenn., January 29, 1877.

Sixty days after date we promise to pay to the order of W. H. Turley, twenty-five hundred dollars, payable at the Commercial Bank, value received, with interest at the rate of ten per cent. per annum after maturity, we as endorsers hereby waiving demand, notice and protest.                H. L. McClung & Co.

This note was immediately endorsed by the payee to the Commercial Bank, a bank then situated and doing business in the city of Knoxville, Tennessee. Soon after this, it was discounted by the complainant, and regularly endorsed by the Commercial Bank, through its president, to said First National Bank, its place of business being in the city of Nashville, Tennessee.

It appears that the Commercial Bank at Knoxville

was the regular business correspondent or agent of the complainant at Knoxville, through which it made its collections in that city.     The habit of business in this agency was, when collections were made, to place the amount so collected to the credit of the principal at Nashville, notify the bank of the same, and send statement the last of the month of the state of the account, which it was usually ordered sent to New York to be placed to credit of the bank in that city.     Under this habit of business, money collected remained in the Commercial Bank, says the book-keeper, till the end of the month, unless otherwise ordered; so that it might or might not so remain, but we infer usually had done so.     There was no contract to this effect, however.

A short time before the note fell due, which was on the 2d day of April, 1877, the bank sent this note to the Commercial Bank, as its correspondent and agent, endorsing it by its cashier, to said bank for its account. It at the same time wrote, enclosing the note, for "collection and credit," which words are explained by the testimony to mean, and were so understood by the Commercial Bank, to collect the note and place the amount to the credit of the First National Bank's account.

When the note fell due, there was no money collected on it, no demand made of the makers or endorser, but a credit was simply entered on the books of the Commercial Bank in favor of the complainant, and that bank notified by letter that the money had been collected.     On the 4th of April, the Commercial

32—VOL. 7.

Bank suspended, and was and is hopelessly insolvent. This bill is filed to enforce collection of the note, against the makers and endorsers. There is no pretense that complainant knew how the facts were, or ratified the action of the Commercial Bank in this transaction. The sole question presented on this aspect of the case is, whether the note has been paid by entry of this credit on the books of the agent for collection. It is not only conceded, but distinctly proven, that no money was ever paid, nor in fact any effort made to collect off the parties to the note.

It is proper to say, that as a matter of fact, the note was made by Bearden, one of the firm of H. L. McClung & Co., who was vice-president of the Commercial Bank, for the accommodation of the Commercial Bank, and so endorsed by Turley, and as between these parties and this bank, the bank was under obligation to take up the paper, or at any rate liable to reimburse the makers and endorsers, in the event they or either of them were compelled to pay it. This is not questioned; but I do not see that this can in any way affect the question presented for decision, as the complainant knew nothing of this state of things, and is a *bona fide* holder of the paper in due course of trade, for value, and consequently the paper was unaffected in their hands by any equities existing between the parties to the same. The bank was entitled to look to all the parties to the paper, when it fell due, for its payment, either as makers or endorsers.

We need only notice the case as to H. L. Mc-

Clung, who alone prosecutes the writ of error. He insists on two matters—one a plea of *non est factum,* which, we take it, is not very earnestly pressed. He claims the paper was made without his knowledge or authority, and not in the course of business of his firm, but for accommodation of the bank, therefore he is not liable to the present holder. His main defense is, that the receipt of the note for collection by the agent bank, and the entry of the credit on the books of the bank in favor of complainant, is a payment and satisfaction of the note, and he thereby discharged He puts this defense sharply on this act alone, by stating first in his answer in support of another line of defense, that the note was never presented to the makers for payment; so that the case stands clearly on the proposition, that the agent has received payment, or the note has been paid, by the simple fact of an entry on the books of the agent to that effect, when no money had been paid, or even demanded from the parties liable to pay; and we may add, from the whole case, none paid by anybody. An earnest argument is made in support of this proposition, which we now notice.

It is claimed this entry pays the note, because it gave the holder a right to demand the money of the agent, a right of action against him, and that if the money had been collected, and placed to credit as directed, the result would have been the same. This may all be true, but does not meet the real question. It is not whether the complainant might not have taken the agent as his debtor, or allowed him to be-

come its debtor instead of the parties to the note, or whether, in the event he had so become his debtor in fact by receipt of the money, he would have been in a better or worse condition, but whether the agent can thus assume the debt, become the sole debtor, without having complied with his instructions as agent, by collecting the money, against the will of his principal, and without his consent, either before or after the transaction. In other words, the question is, whether an agent for collection of a note, has the right, without receiving the money on the same, and without the assent of the holder of the paper, or knowledge of facts, to release the parties to the paper, and himself become the debtor, and discharge the other parties to it. This is the real question when fairly stated, as I think. The fact that the agent bank made the entry, in form showing a payment, as I think, does not change the result; it was still a payment by an entry on the books to which the owner of the paper was not a party, and by which he could not be bound. If the affirmative is maintained, then it must stand on the theory, that a party can have his debt discharged in a way not contracted for, without his knowledge or consent, and in addition have a new debt made, and a new debtor substituted, in the stead of the one then owing him, at the will of a third party, and against his own; and further, the parties released, are thus relieved without request, or assent at the time. They (the other parties bound) have but to accept afterwards this easy mode of paying their debt in this case, and they are relieved; and instead of having to

look to a broken bank for reimbursement, as would have been the case under their contract, they find themselves reimbursed at once, and indemnified in the matter of liability incurred for the accommodation of this bank, and all by the magical effect of an entry on the books of the agent for collection, to this effect. This, it seems, would be an excellent view of the matter for these accommodation debtors, but hardly compatible, as I think, with the rights of the holder of the paper, who ought at least to have some voice in the matter.

Let us look at the authorities cited, which are supposed to support this position. The following is relied on from Parsons on Contracts, vol. 2, 137, under title payment by delegation: "Payment," he says, "may be made by an arrangement whereby a credit is given or funds supplied by a third party to the creditor, at the *instance* of the debtor. But such an arrangement must be carried into actual effect to have all the force of payment. *Thus,* where a debtor directed his bankers to place to the credit of the creditor, who was also a customer of the bank, such a sum as would be equal to a bill at one month, and the bankers agreed to do so, *and so said to the creditor,* who assented to the arrangement, and the bankers became bankrupt before the day on which the credit was to be given, this was held to be *no* payment, and the creditor was permitted to maintain his action against the original debtor on the liability. It would doubtless have been otherwise," he adds, "had there been a remittance or actual transfer on account of the debt; for it seems

to be settled that the actual transfer of the amount in a banker's books, from the debtor to the creditor, *with* the knowledge *and assent of both,* is equivalent to payment." No doubt this is sound law—at any rate we need not question it for the purposes of this argument—but so far from supporting the position for which it is cited, it is conclusive in support of the opposite view. The whole arrangement is assented to by the creditor, the debtor and the banker, and when the credit effects the payment, it is because it is with the knowledge and assent of *both.* No one can doubt that parties may assent to such an arrangement, and when carried into effect it would discharge the debt, regardless of the subsequent insolvency of the maker. But this cannot apply to a case where the credit is entered without the assent of either party at the time, and only consented to by the debtor, after the bank has become insolvent, but dissented to by the creditor as soon as known to him. This authority alone would repel the defense insisted on.

The case cited for the above by Parsons, is *Eyles* v. *Ellis,* 4 Bing., 112, which was this: The *creditor* had authorized the debtor to pay in at a certain banker's the amount due. Owing to a mistake, it was not then paid; but the debtor, who kept an account at the banker's, transferred at a short date after the time, the amount to the credit of the creditor. This was done on Friday, but the creditor had no notice of it till Sunday, and on Saturday the bank failed. This was held a payment, but because the plaintiff, the holder of the paper, had authorized the sum to.

be paid into the bank for him.   The debtor had the money in bank, and actually transferred it to the credit of the holder before the bank failed;  so that the arrangement was precisely what both parties had assented to, and was complete before the failure.   In the case before us, McClung & Co. had no funds in bank, none were authorized to be transferred by them—in fact, the bank alone acted in this matter.   There is no similarity even in the cases, except the fact that a bank was the agent in that case and in this.

The case in 4 Heisk., 449, was where the money was actually paid to the agent by a third party for the debtor, and the agent absconded.   This was held a payment, on the ground that it made no difference to the creditor whether the debtor paid the debt himself, or a third party paid it to the creditor's agent for him;  but the money was actually paid.   So, if McClung & Co had paid the money themselves, or a third party had paid it to the bank for them, no doubt it would have been a payment.   But suppose in the above case, instead of any money having been paid, the agent had simply made an entry on his books, chraging himself as debtor to the principal, as if he had received the money, without even the knowledge or direction of the debtor (and that is this case), could he have successfully defended a suit on the original claim, and said you must look to your agent for your money?   Would the argument have been effective, that it can make no difference to you, the result would have been the same; if the money had been paid in fact, the agent would have been liable to you

for it, and you would have lost it anyway? The answer would have been—that is not your business; you have not paid your debt at all, and until you have parted with your money in accordance with the contract, or in some other way discharged this debt by my assent, you still owe it and must pay. Whether it would have been the same thing in result if the money had been paid by McClung & Co., no one can certainly say. It might have been the bank would have remitted it in view of its threatened insolvency, though it is not probable. The result, however, is not the question—it is, was the debt paid?

It is argued, however, the National Bank, by its letter of instructions, asked for a credit on the books of the Commercial Bank. This is not the fair meaning, nor the terms of their letter. It is—*collect,* and then enter the credit—get the money from the makers; when this is done, place the money to our credit. No credit is authorized until the other act is done, that is, the money received—until then, no credit is authorized.

The principle cited from Danl. Neg. Notes, sec. 1221, based on *Savage* v. *Merle,* 5 Pick. R., 83, Supreme Court of Massachusetts, is in accord with all this: " *Credit* given by a drawer of a bill, or by a party to it who is liable for its payment, to the holder *at his request,* is equivalent to payment." No such case is before us. If the holder had agreed with the debtor, or requested of him to have a credit given him with the bank to the amount of the note, and this credit the mode of payment, then compliance

would have been the satisfaction contracted for, and would have been a satisfaction. But here no mere credit is asked, but a collection, and then to be credited. We have the credit, but no collection.

The reference to Morse on Banking, 424, is simply a question as between a *bona fide* holder of a note, who has received it in due course of trade from the holder for collection—quite a different question from the one presented in this case.

We believe this is all the authority cited in support of the argument of defendant.

We now present the authorities and a few considerations in support of the opposite view.

Some confusion, perhaps, is found in this case, because of the fact the Commercial Bank was party to the bill as endorser, as well as agent for its collection. The rights of the party holding the paper, however, and the duty of the agent were precisely the same as if no such liability had existed. Suppose the paper had been sent to a third party as an agent having no connection with it, could such third party have paid this debt for the maker and endorsers, without the knowledge or request of either of them, and without the assent of the holder, by a mere entry of the fact on his books? We take it, no one would maintain the affirmative of this proposition. In effect that is precisely this case. We may suppose even a stronger case—that one of the parties liable on the paper had requested him to assume the debt for him; it is certain this would have been no payment, till assented to by the holder.

It has long been settled in this State, that an agent has no authority to receive in payment anything but the money: 1 Meigs' Dig., Milliken's ed., p. 119, sec. 107. If he takes the note or obligation of a third party in payment, the debt remains unpaid by such a transaction. What is the difference between that case and the present, or the case of the agent simply giving the principal credit on his books? He thereby simply substitutes his own liability for that of the original debtor, as in the other case, he agrees to take the note of a third party. It is the substitution of one liability for another in either case, without the payment of the money. There can be no difference in principle between the cases. It would not be a very satisfactory reply to a suit by the holder of a note, which had been paid in the note of a third party, to say, that had it been paid, you would only have had the liability of the agent, you now have the note of a third party. He may well reply, no authority was given to do anything but receive money; I have a right to say who shall be my debtor; whether I shall lose or gain by it, is not for my debtor to say; his promise was to pay the money; when that is done his contract is discharged, not before. There is no magic in an entry on the books of a bank. The bank would have been equally the debtor of complainant had it received the money, though no entry had ever been made on its books at all. The payment in fact raised the liability; the entry would be the evidence of a pre-existent fact. If the authority had been conferred on the agent, his entry

would have represented a fact, an act authorized; but without the payment of the money, it represented nothing, except the will of the agent; and so we would have the debt paid at last simply by willing it, and making an entry to represent this operation of the will of the agent—I say it is done and it is, notwithstanding it never has actually been done. The holder, we think, may well say, that he should have something to say before his debt shall thus be discharged.

We look at the authorities on this question. The case of Levi v. National Bank of Missouri, reported in Central Law Journal, vol. 7, p. 249, was a case where a draft had been sent for collection to the bank. This agent received from the debtor a check on another bank as a mode of payment, which was presented, and certified as good, and then the agent bank suspended on the same day, having previously, however, credited the principal with the amount, as if the money had been collected. The next day the money was collected on the check, and mingled with the other assets of the bank. A receiver, under the national banking law, was appointed to wind up the bank. The question was, whether the bank was a general debtor to the plaintiff by reason of the credit, or whether the money was to be held by the receiver in trust for the creditor. It was held by Judge Dillon, that he was entitled to the proceeds of the draft, and that there was no payment till the money was actually received. He says: " I am of the opinion that the bank remained the agent for collection of the draft

until the money was actually collected. When the money was *received* and not before, the agency of the bank to *collect* terminated, *and its authority* to credit the amount to plaintiff, and to make itself an absolute debtor therefor would arise." The same argument was urged in that case as this. It was said the letter transmitting the draft for collection, was simply asking a credit with the bank. The words were (as in this case) " for collection and credit," and it was argued, " the *ultimate object* of the plaintiffs being " credit," if they received the credit, it matters not to them whether the defendant bank received the money or not; as soon as the bank was satisfied to give the credit, as requested, the plaintiff's demand was complied with, whether the collection was made or not." The court replied : " The argument is fallacious. The words ' for collection and credit,' do not mean that the credit shall be given until the money is collected, and it does make a difference whether the bank ever received the money or not." He then cites *Sweating* v. *Pearce*, 7 C. B. R., Byles, J.: " It is not disputed that the general rule of law is that an authority to an agent to receive money, implies he is to receive it in cash. If the agent receives the money in cash, the probability is he will hand it over to his principal; at all events, its receipt in other paper would diminish his chances for receiving it, and on this principle the agent can only receive money." If this be sound, and the receipt of a check on a good bank, not sufficient basis on which to enter a credit which shall be a payment, much more is the simple entry, with nothing received,

an insufficient ground on which to predicate a payment. The theory of these cases is, that the authority must be complied with, or else the act of the agent is nugatory. That authority was only to collect, then to credit—credit without collection was an unauthorized act, which bound no one, unless assented to, much less could it pay complainant's debt and discharge his creditors.

Judge Dillon adds, language which we adopt: "The force of the argument of the defendant, that the bank on the day of failure, when it was in *articulo mortis,* had the right, by a credit in advance of collection, or by its unauthorized act, to terminate the agency and constitute itself the actual debtor of plaintiff for the amount, without his consent and against his interest, is one I confess I am unable to appreciate." Numerous cases in England sustain the above ruling of Judge Dillon. They will be found cited in Central Law Journal, from the Law Times, vol. 7; p. 271.

The rule is thus laid down in *Barker* v. *Greenwood,* 2 Young & Collier, Ex. R., 414: "An agent with a general account like this, is only bound to receive payment in such way as thereby to put it in his power completely to discharge the duty he himself owes his principal. If, therefore, he is bound to pay the whole over to the principal, he must receive it in *cash* from the debtor; and a person who pays such an agent and who means to be safe, *must see* that the mode of payment does enable the agent to perform that duty." This rule is even held imperative in England, where there is a custom that might vary

it—the courts holding the custom, unless assented to by the principal, is in violation of the legal right of the party, and therefore not valid : See *Pearson* v. *Scott*, English High Court, Ch. Div. Rep., Center Law Jour., vol. 1, p. 194. The English cases seem to show an almost unbroken current of authority in support of the principle we have maintained in this opinion. We have seen nothing to the contrary.

We but add, the principle seems to be based in sound policy as well as sustained by the analogies of the law. That a party who deals with an agent, who is only authorized to collect in money, should be allowed to pay in something else, would be to allow him to aid in a breach of known duty on the part of the agent. To allow an agent to be paid by a mere credit, so far as the debtor is concerned, is to authorize him to receive for, and discharge a debt, in that which will not pay his principal, and may work him injury.

In this case, we can also see how the bank would be tempted, on the eve of insolvency, to relieve its friends who had become liable for its accommodation, to pay them off by a mere entry, and leave its correspondent to take the chances out of its assets. This is grossly unjust, as the parties had voluntarily incurred the liability, and can rightfully be discharged from it only by parting with their money, as agreed, to the holder of the paper.

It is not pretended any money has been paid, nor even a request that the debt should thus be discharged, on the part of the makers of the note. Only

the latter part of the instructions have been pursued—that is, "credit"—forgetting that the condition precedent to this is, collect. This has never been done. We but add, in the language of Judge Dillon: "It is not unusual for bankers to credit their correspondents or creditors with the amount of paper of a certain character, at the time of its receipt for collection, but such credits are provisional only, being made in anticipation that the paper will be promptly paid, and with the right to cancel if the paper is dishonored." For this he cites *Trinidad National Bank* v. *Denver National Bank*, 4 Dill. R., 290. "Such," he says, "was the nature of such a credit, and the circumstance is immaterial and does not vary the ultimate rights of the parties": See Alb. Law Journal, vol. 18, 254.

If this be correct, and it is certainly sound, it is clear a mere entry of a credit does not conclude the agent bank; and if so, on what principle can it be claimed to be conclusive on the other party? How such an entry can be provisional as to one party and in his favor, and conclusive as to the other, when he is to be the loser by it, we have been unable to perceive. Some controlling authority at least should be presented in support of such a conclusion. As we have shown, none such has been found, and we take it, none such can be found.

The theory of this opinion is, that payment is a question of fact. To accomplish it, there must be an actual transfer and delivery of the thing agreed to be paid, or something else in lieu of it; but this last can only be in case of assent equivalent to a contract.

Here a simple credit is sought to be substituted instead of actual payment, the authority being only to collect, and then credit—the credit alone is without authority, never having been assented to by the holder of the paper. In order to make the payment, the facts must be known to the holder of the paper and assented to by him. If, for instance, the bank at Knoxville had said to the Nashville bank, this paper was made for our accommodation, and we will take it up by a credit of the amount to you, then such a course assented to would have been a payment. But no such thing occurred.

The simple question in the case, as I think, is, whether the parties to the paper shall be held to their contract, or whether they shall be paid, released or indemnified from the liability incurred, by a mere entry on a book, to the detriment and loss of the debt by the holders, who had paid value for it in due course of trade Who ought to lose by the insolvency of the bank—the makers of the note for accommodation, or the innocent holder for value? On this question I cannot hesitate.

For these reasons, I dissent from the opinion of the majority of the court in this case.